McGillivy You have three minutes for rebuttal, ten minutes total, so seven minutes out of the Everybody ready? All right, let's begin. Thank you, Your Honor. And may it please the Court, my name is Neil McGillivy, and I represent the— Wait, you said it different than I just did. Well, Judge, on a first try, I think yours was as close as I've heard in my 20 almost years here. That's true. Judge, as I said, may it please the Court, my name is Neil McGillivy, and I represent the appellant in this matter. The issue here, Your Honor, is this. How the impact test formulated by the New York Court of Appeals and Hoffman should be applied in failure to hire or failure to promote cases where the plaintiff is a non-resident but the prospect of employment is in New York. Now, Hoffman didn't address— It didn't, and I've been looking for a state case that did address that. Have you found one? No, I haven't, Your Honor. A couple of federal cases. Well, it's quite—I mean, something of an aside, one of the questions we considered when we put together our brief was whether to ask this Court to certify the question to the Court of Appeals. That's what I was about to ask you. And the odd thing is this, as Your Honor points out, there are no state cases that address this issue. The only cases, it appears, come out of the Southern District. Now, obviously, amongst— They're split. They're split, exactly, Your Honor. And the case here stands on one side of the split. It stands alone. On the other side of the split, there are a number of cases. I think it is fair to say that the primary one amongst them is the Anderson case and that the other cases, in large part, rely upon it or rely upon the reasoning in that case. And we think the reasoning there— I just want to say that either side has a sort of crazy reasoning. I mean, I think there's a certain plausibility to each of the arguments. But the New York State Court of Appeals and no lower New York courts, as far as I can tell, have weighed in one way or the other. No, they haven't. And, Your Honor, what I think makes the— And again, obviously, I'm here to make the argument, but I will concede this in thinking some more about it. What makes it possibly trickier still is that it regards the city human rights law. I mean, there was language at the time, Hoffman, about the city human rights law and the state human rights law to the effect that it covers people or persons in the city. That was the city law language and persons within the state. That was the state law language. The particular provision, though, from the city law has actually since been repealed. It was repealed in 2018. Now, the language—the same language is repeated elsewhere, meaning in the city charter. But that didn't prevent the federal courts from still splitting, right? No, it didn't. And I think, in truth, I don't know that— Obviously, Hoffman referred to the language because it was construing both statutes. I don't know how much necessarily turns on the particular language. I think it's—the question is a broader one. It's not focused, as it were, on the meaning of specific phrases, specific words within either statute. And I think, Your Honor, here, obviously, as the failure to promote case, where you have an existing workplace outside of New York and a prospective one inside of New York, the cases—and this seems to be the first of a kind, too— the cases below, other than this case, all involve failure to hire. And I think the inequity of the reasoning from the court below here is seen particularly vividly in those cases because the anchor, as it were, being sought with regard to a non-resident plaintiff is that that person already be employed in New York. But, Your Honors, let's say someone is not hired for a position in New York who is unemployed at the time. Or, even if they are employed, the anchor from a jurisdictional point of view put forward by the court below is employment that has nothing to do with— So what— I'm sorry, go ahead. Even if they're unemployed, they are somewhere. They're in some state. Right. Your client was in the District of Columbia. I don't know what the anti-discrimination laws there may be, but I can't believe they're indulgent for employers. So if your client is denied an opportunity to transfer to New York for reasons that are discriminatory, your client has a remedy in D.C. And you're saying there's also a remedy in New York. Well, I think there's a remedy in New York. I don't know if there was a remedy in D.C. I don't know what the jurisdictional reach— Do you think it's possible there's— there are no anti-discrimination laws in the District of Columbia? Oh, no, undoubtedly. But I don't know, Your Honor, from a— I don't know what the answer would be to the jurisdictional question there based on these facts. I don't know the answer to that. I will say this, though, that it's not a physical location test, meaning that, for example, let's say my client, who was resident there, had traveled to New York around the time the decision was made. She would then be a person within the city boundaries or within the state boundaries. But that's not what the test— I'm sorry, I think I just confused you. I think I just heard you. I want to clarify what I hear. My understanding of the cases is that they tend to focus on where the person is, but then we have Hoffman, which says it can be a non-resident. And then there's a lot of quibbling over whether or not someone had enough ties. A case in which the job was in New York, right, where someone— there's not a, you know, did the discriminatory actor live there? But, like, the job, where someone had to go in every day, that would be a job that you would say would clearly fall within the scope of Hoffman. Is that correct? Yes. And I think, yes, Your Honor is right in this regard, that at least all the state cases, including Hoffman, they deal with a workplace, a single workplace, that's outside in New York. And then the question— So in the case of—I just don't want to make this case harder than what we have. Right. Right. So if the job is in New York— Yes. —and Hoffman says that non-residents are covered under certain circumstances, wouldn't the circumstances in which somebody was covered be a job that was in New York? Yes, Your Honor. OK, so then should I be disturbed or troubled that I couldn't find anywhere in the record an allegation that the new economy forum editor was actually a job that was in New York, or that she applied for—that she actually applied for the U.N. position, as opposed to express interest in the U.N. position? Right. And, Your Honor, I think in that regard, the allegations in the complaint could be more direct with the amended complaint. I think—and I think it's pages 46 through 48 of the record, and I think the particular paragraphs, I think it's 79—or 77, 79, 82, and 84. Well, I guess the question I have is, without specific allegations, why aren't we in that land that was concerning, like Schreiber and Curram, where folks were saying, you know, it's too speculative. We don't know what's going to happen. Well, Your Honor, the answer I would give is this. When you read those four paragraphs together, what you have is an expression of interest by a palantir to her boss in D.C. with regards to the U.N. reporter position in New York. You then have, if you go to the final of those paragraphs, 84, you have her boss telling her that the decision-makers in New York decided they weren't going to give her the job. Now, it could be more direct. The allegations could be more direct in terms of she applied for the New York City-based U.N. reporter position. But I think if you read the four paragraphs together, that is clearly what happened in that. It's simply that her application, which is expressed in terms of an expression of interest, but her application goes through her superior in D.C. What about the new economy editor position? Is there an allegation that that is a New York job, that she's going into an office, she's going into New York, she has to be in the subway? Is that somewhere? Well, I think, and Your Honor, I may have to refer myself to the record, but I think it's page 46 of the record, and I believe it's paragraph 82, it is page 46, and it reads, in April 2018, Plaintiff Said applied for the new economy forum editor position amongst others in New York. Now, again, it certainly could be more detailed, but I think for pleading purposes, that would suffice to... But you understand, my concern is I don't want there to be a question of speculation about whether or not her beat is in New York, but she's actually living in D.C. No, I understand, Your Honor, but I think... No, no, and I certainly, I do understand that point. I think, again, and I'm happy to... No, well, maybe not happy, but I will concede it, that the allegations could be more detailed in that respect. But I think with regard to the U.N. reporter position, when you read the allegations as to her applying for that position from start to finish, whereby she expresses interest through her superior in D.C., but then in, I think it's paragraph 84, it's certainly page 48, she's told by the same superior that the decision makers in New York have decided they're not going to give her the position. I think that would certainly suffice for the U.N. reporter role. I don't think there's any question that the U.N. reporter role was one that was based in New York City. Now, this is a putative class action. Yes, it... Now, who constitutes the class? Are the... Is everybody in the class people who wish... They're in all states. No, Your Honor, I think the... I mean, there is another plaintiff whose case remains pending before the court below. I think certainly the allegations in the complaint are quite thin as to the putative class. They were nonetheless sufficient to allow for removal, but they are thin. I do not... They are thin, but who are they? Right, well... Are they all looking for positions in New York? Well, Your Honor, I think the class would have been broader to the extent that... Obviously, the allegations in her complaint go back further in time to different positions that she held, and I think the overarching... In the Middle East. Well, in D.C., I think primarily. Because the complaint is talking about the Middle East as well. No, I know that, but I think that... I don't know who the class is. No, I know, Your Honor, and... And if we're going to ask, for example, if we're going to ask the New York Court of Appeals to decide whether this claim subsists, they really ought to know what they're talking about. No, I know, Your Honor, and I think that certainly, as of now, it's better treated as an individual claim. I don't expect that a class will emerge in the future. Obviously, it was... In terms of the pleading, the pleading was at a much earlier stage. I do think this. Were that the issue here, there would be real, probably insurmountable challenges in terms of establishing a class. Do I hear you withdrawing the class action? Claim? No, Your Honor, I'm not withdrawing it, but I certainly am... But I don't know who's in it. I don't know what it is. No, I know, Your Honor, but I... Obviously, in terms of the procedural posture of this case, that aspect of the case didn't ripen in any way whatsoever before the court below. And in terms of me standing here, I'm not... Again, I will concede, I'm not in a position to authoritatively address, except to say this. Obviously, there are allegations here about decision-makers in New York that were discriminating in a wholesale fashion against women within Bloomberg. Now, in terms of if the case were... Again, if the case is revived, and if it further proceeds, obviously, plaintiff here will have to, as it were, put a little more meat on the bones of those allegations. But right now, I'm, as it were, I'm confined to the complaint. And as I said, Your Honor, I do accept that the allegations in the complaint as to who the class would be are thin. All right. Well, you've gone over, but I think we've spent most of that time pronouncing your name. Thank you, Your Honor. We'll hear you for three more minutes in rebuttal, but we'll now hear from Ms. Bloom for 10 minutes. Thank you. May it please the Court. I'm Elise Bloom. I represent the appellees in this case. I wanted to start by pointing out that there's a significant difference between a failure-to-hire case and a failure-to-promote case within the framework of Hoffman and also within the framework of Vengas. The key fact is, where did the plaintiff feel the impact of the alleged discriminatory decision? In this case, the plaintiff, we all agree... Wait a minute. Why are we focusing on the plaintiff when both statutes say that it's not just the individual, but the greater New York area, like the idea of discriminators and when one diminishes the quantum of discrimination and discriminatory actors, that benefits everyone, including languages about society at large and the importance of a democratic structure and the like like that. Where is the plaintiff? Why is where the plaintiff located? Because where the plaint... Because the test, as articulated by the Court of Appeals in Hoffman and as reiterated by this Court... But the Vengas case was just where somebody lives and works. So why wouldn't the locus of where the job is be the determinant factor? Because under the law, the locus of the determining factor is where did the plaintiff feel the impact. And in this case, where you have a current employee... So under that analysis, wouldn't that mean that that we would be exempting an entire category of discriminatory action, i.e. failure to hire? But this is not a failure to hire case. This is a failure to promote. Okay, but answer that question. Under your logic, does that mean that mean both New York laws that are at issue are categorically exempting failure to hires for non-residents? I believe that they would because I believe that the laws are pretty clear. It's sort of a two-step process. The first thing is it protects inhabitants of New York. I mean, the purpose of the law is to protect the people that live here. Then each of the laws has been... Well, people who work here, I mean, somebody who lives in Connecticut and they come into work in New York, they're protected. Yes, if they... So it's not just the people who live here. Well, I was going to go to the next step, and if somebody comes here to interview for a job and is told we don't want people like you, doesn't that person feel the impact in New York, even if they flew in from Nebraska? I think, I mean, potentially in a failure to hire case, but in a failure to promote where you have a current employee, where Ms. Saeed felt the impact was in DC because the impact of, the result of the fact that she did not obtain a job in New York is that she continued in DC. Interview for that promotion and didn't get it. I don't think that changes it. And was told here in New York, we don't hire people like you or we don't promote people like you. We don't give people like you jobs like this. I believe that under the Hoffman case for an incumbent employee, as, you know, you're, as unfortunate as your facts sound, for an incumbent employee and picking up on a point that you made earlier, Ms. Saeed may have had a claim under the DC human rights law because that's where she felt the impact. I mean, the court of appeals was pretty clear that when you have a current employee who is a non-resident of New York, you have to see, you have to determine where is the impact. But there's three federal cases that have gone the other way on this, right? Yes, and I can address those cases. Well, I mean, I guess all of that seems to be an argument for certification. It seems to me if there's no state law case that deals expressly with a failure to promote or failure to hire case, and there are three federal cases that interpret this very statute the other way, doesn't that almost per se reflect that we would benefit from having the New York Court of Appeals resolve the dispute? It's their statute. It's their statute, but I believe that they have resolved the dispute as it applies to a current employee. And that, I mean, Hoffman dealt with the situation very similar to this. You had an individual in Georgia and his- No, no, I think we all know what Hoffman says. Right, but, I'm sorry, go ahead. No, that's okay. It just seems to me we haven't had a case in New York State Court that involves prospective employment. Am I wrong about that? No, you are correct about that. And there are two federal cases that deal with this whole concept of prospective employment, and that's the Wang case and the Schreiber case, and both of those cases, both of which dealt with incumbent employees as opposed to an applicant, both of those cases, relying on Hoffman and relying on this court's decision in Vegas said, you've got to look, where does the plaintiff feel that you have? Again, that was the quibbling though, the quibbling over how close their connections were to New York. One of them, they never stepped in the office. The other one, they were arguing that they were hoping to get a transfer. Explain to me why that isn't fundamentally different than a case where the person is going to work in New York. In the Schreiber case, the plaintiff was hired to work in New York. Yeah, but did not step foot in New York, right? They did not step foot. That was what Judge Ramos decided, right? Because of the pandemic, they never ever went into New York. And so then I just, I don't want us to be in a position where we're talking about quibbling, like where is this much enough? I'd like for you to address the situation which we may have now where the person's job is going to be in New York. And the only thing I've heard you say is that you think that it is reasonable to categorically exempt failure to hire claims from these two statutes that multiple times have been said need to be interpreted broadly. Is that right? No, what I have said is that there is a significant difference for purposes of the impact test between an incumbent employee and an applicant. And that with regard to an incumbent employee, that person, like Ms. Saeed, felt the impact of her failure to get the job in New York by the fact that she needed to remain in D.C. The impact that she felt, she was an incumbent employee, and that's why she felt- But why would it matter? So we've got two applicants for the job, we'll say three, two of whom are African American, one of whom is white, and the two African Americans, one is an incumbent in Washington, D.C., and the other works for the Department of Agriculture in D.C. Why would it matter in terms of where they feel the effect of the discrimination? That one happens to be currently hired by the same company? Well, in the scenario that you just described, I would argue that they both felt the impact in D.C. because they both remained in D.C. as opposed to coming to New York. Right, that's what I mean. Why would it matter? So it seems to me then, the fact that one is an incumbent employee has nothing to do with this. Well, the only thing that it has to do with this, Your Honor, is that all of the cases deal with individuals that were incumbent employees and- Well, most of them are terminations. They're wrongful termination cases, right? Except for the two district court cases are, well, one's a termination, one was somebody that was asking for a transfer. The Wang case was asking for a transfer. I mean, if you look at the Anderson case too, it's a complete outlier. Anderson relied upon the Reagan case, and Anderson was pre-Vengas. And when I read over Vengas again, it talked about where does the plaintiff, where did the plaintiff feel the impact? And there, the plaintiff did not feel the impact in New York City and fell squarely within the four corners of Hoffman. If you look at the Anderson decision, the Anderson decision relies on the Reagan case. But I guess the question here is a little different, right? I mean, I guess it could be characterized as where would the plaintiff feel the impact? It's not clear from New York State's case law whether that's the proper way to frame this. But what is the downside to letting the New York Court of Appeals take a crack at what appears to be an issue of first impression for that? Because I believe that for incumbent employees, they've already answered the question. Because remember in Hoffman, what the court said, the purpose of the impact test and the reason why the court came out with the impact test and held the way it did was because one, it wanted to provide a test that was simple for courts to apply and litigants to follow. Right, but in that same paragraph, didn't it say it's intended to cover people who work in the city? And if they are working in the city, why isn't the center of interest where the job is? I mean, it seems to me that what that is meant to say is that if you live here, if you're a resident, you got one set of claims. It also covers non-residents who work here. Who actually work here. Right, but then you're imposing a temporal restriction that you are trying to mask as a territorial restriction, right? Like you're trying to say, hey, they have to work here right now as opposed to they will work here if they get the job. No, what I'm saying is that Ms. Saeed, if she had a claim under state law, she would have had a claim under the D.C. Human Rights Law, much like Mr. Hoffman, if he had a claim under state law, would have had a claim under the Georgia Human Rights Law. And neither of them pursued their state law claims in the state where they were actually working. What about someone from Texas? Does Texas have a human rights law like this? I mean, you're asking us who are here, who only have jurisdiction here, to be interpreting whether or not someone else in another area outside of our jurisdiction would have a viable claim. Well, actually not. What I'm asking you to do is I'm asking you to look at what the court said in Hoffman. And the second thing that the court said in Hoffman is that the impact test needs to lead to predictable results. The predictable results in this case, consistent with Hoffman, is that Ms. Saeed, who was working in Washington, D.C., when she didn't get the job, what happened? She stayed in Washington, D.C. That's where she felt the impact. It seems to me that, I mean, that might be painting this with too broad a brush. Because if there she applied for a job and her employer arguably reached out to her while she was in D.C., but what about a person who's up here from D.C. on vacation and decides to knock on a door in New York of somebody who doesn't advertise their positions in D.C., but nonetheless says, well, I'd be willing to move to the Big Apple. Who wouldn't? And I'd love to work here. And then they make an overtly racist or sexist comment about why this person is not employable. Your view is that that person could then go back home to D.C. and bring a claim against this employer that made discriminatory statements and a non-hiring decision in New York under the D.C. Human Rights Law? I think that in that situation, the person, again, consistent with the case law, would have a claim in New York. And why I say that is because if you look at the Reagan decision, which is what Anderson was premised on, in the Reagan decision, there was conduct, there were things that happened to Ms. Reagan in New York. So if the discriminatory conduct takes place in New York, you're saying then that the impact test is met regardless of where the plaintiff resides or works? I'm saying that if the plaintiff experiences the discrimination in New York that under decisions like the Reagan case or even the Cranian case, which I thought was sort of interesting because the court was trying to determine how far does the human rights law go. And it said, well, for those things that happened in New York where the plaintiff experienced the conduct in New York, they have a claim under the New York laws. For those things where the plaintiff experienced the impact of the discrimination somewhere else, the New York law doesn't cover them. That's all that we're saying here. The plaintiff experienced nothing in New York. She experienced everything in D.C. And that's exactly what the impact test is designed to address. Okay, so what would happen if a person who is a non-resident but otherwise works in New York was on a plane when they got the news that they weren't being hired? Did they feel that discriminatorily impact when they were over the state of California? I mean, what my concern is is why is that kind of impact more predictable than the idea of does a person live there? Is the job there? And then maybe there's some gray areas about where we can be hashing out with somebody in New York enough, right? Like, why can't we conceive that living there, job there, enough? Because you have to be working there. But your scenario actually occurred in one of the cases, and I apologize. I don't have the name of the case in front of me, but you had an individual who was actually working in New York and then I believe was in Paris or something on a business trip and was terminated. Well, in that case, of course, they're covered by New York law because they work in New York. So, but it's not, so you would concede that it's where they work as opposed to, like, when is it where they work versus impact? It's always where they work. And Ms. Saeed worked in D.C. She didn't work in New York. This, that's, that's, I think that punctuates the point here because that plaintiff who worked in New York, the fact that she was terminated- So it's where the job is. No, it's where the plaintiff works. Ms. Saeed did not have a job in New York. Ms. Saeed had a job in the District of Columbia. But I thought it was where the plaintiff feels the discriminatory animus. I thought that's what you said a minute ago. Well, she feels the discriminatory animus in D.C. because she's staying in D.C. She's not going to New York. Okay, but so if I'm on the phone in New York, I don't work or live here, but I'm in the phone in New York and a D.C. employer tells me over the phone that they're not going to hire me because of my race, I experienced the discrimination in New York? I believe you would. And in that case, if you were a New York resident, clearly you would be covered. And if you were working in New York, you would be covered. The critical distinction is that Ms. Saeed was working in D.C. and how she experienced the impact was that she had to stay in D.C. All right. Well, I see we've gone over a little bit. We're going to hear for three minutes from rebuttal from Mr. McGillivy. Thank you. Say it again for me before your time starts. Mock-ular-wee. Mock-ular-wee. Yes, Your Honor. Mock-ular-wee. I should know this. Well, Your Honor, this is the trick, as it were. There's no letter V in the Gaelic language. So B-H is pronounced like a V in English. Right. I know that for Siobhan, but I'm still having trouble with your name. Anyway, go ahead now. Indeed. Well, Your Honor, if you can pronounce Siobhan correctly, which you just did, you've passed every test. Your Honors, I think Judge Perez, a point you had raised with opposing counsel was about predictability of results. And I think the courts below on the side of Anderson in that regard have drawn a clear distinction between, on the one hand, a definite job in New York, as opposed to, in the language that's used, either unspecified future career prospects or, and again, I'm quoting, I think, from the crime case, the hope to someday down the line work in New York. And I think the court below here has erred in that regard, in that it has used, or cited that, or quoted that particular language. But that doesn't apply here. Following that argument, hypothetically, let's say you have someone who works for Bloomberg and seeks a job as a bureau chief, and there's a bureau chief job in New York, and there's one in Chicago, and there's one in Los Angeles, and there are probably other cities in the country where there's a bureau chief. And she's turned down for, we're not going to promote you to bureau chief. We don't think you're qualified for it. Where does that person experience the discrimination? All the other facts the same as this. No, I understand. Well, in terms of the New York bureau chief position for which she applied, under New York law, city and state, she experiences the effect or the impact in New York. She can choose New York anti-discrimination law, Chicago or Illinois anti-discrimination law, California anti-discrimination law. And if the job in California is in San Francisco, San Francisco anti-discrimination law, how manageable is this? But Your Honor, I think that the point in that scenario would be this. There are discrete positions in terms of the bureau chief position. So you have to take each one separately. She wants to be a bureau chief in any of these places. Well, yeah, but- That's usually how people, I mean, people are ready to move here and there to get a good job. Possibly. But I think here, Your Honor, in terms of the allegations, clearly the position she sought over the course of her career with Bloomberg were always location specific. Yes, but I mean, if we ask the New York Court of Appeals to decide this, they would have to deal with the kind of scenario that I'm talking about, wouldn't they? Well, I think, Your Honor- Otherwise, you have somebody able to pick their jurisdiction and to jump around and decide that New York has the most favorable law. So even though I've been denied a job all over the place, I'm going to sue in New York. But I think, Your Honor, that would assume that the equivalent human rights laws in those other jurisdictions have a similar reach to the one in New York. Obviously, both state and city, it is a, as it were, a leader, both the state and the city, in terms of the reach of its respective laws. In terms of other states or other jurisdictions, again, it's not briefed. And I cannot say, as I stand here, that, for example, Illinois law, to take Your Honor's example or hypothetical, I don't know that Illinois law could apply in those circumstances. Maybe Illinois doesn't have any anti-discrimination law, and someone offended there by discrimination would have to sue under the federal statute. But the question is, where would, in my hypothetical, where would the plaintiff be feeling the harm? Well, the impact is felt where either the existing workplace, when it came to the Hoffman case, or the prospective workplace, as here, is located. In my hypothetical, there could be 10 prospective workplaces. Yes, and I think, but again, the assumption would be that you have similar laws in those other jurisdictions. And I think for New York purposes, New York courts, whether state or federal, can only concern themselves with the reach of the state and city laws. I don't think, and again, she may well have had a case, I don't know, in D.C., but simply because she had a case or a potential case in another jurisdiction does not preclude, or should not preclude, the possibility of taking a case here. And again- I don't want to take up all your time. No, no, Your Honor. And I will say very, very briefly, actually, Judge, a question you had asked me in terms of the class. I have spoken with trial counsel about it. The class here would be, it's New York job applicants during the class period for the positions of either reporter, editor, or producer for New York-based positions. To the extent that the case continues below, that would be the class that plaintiff here would look to certify. Who would provide the job for discriminatory reasons? Exactly. Exactly, Your Honor. For discriminatory reasons based on sex, race, religion, anything? Well, in her case, it's both sex and race. So for those two reasons. Well, thank you both. We will reserve decision. We'll now move to the next case on the calendar this morning. That is Agoost Jr., Jr. versus Garland. Thank you, ma'am. Thank you. Okay, we all set? So Ms. Perloff-Giles, am I pronouncing your name right? Perfectly, thank you. That's a lot easier than that last guy. Anyway, you have 10 minutes total, but you've got two minutes of rebuttal that you've reserved. So that gives you eight minutes now. You may proceed. Thank you, Your Honor. And may it please the court, Alexander Perloff-Giles from Gibson, Dun & Crutcher on behalf of the petitioner Jean-René Agoost, Jr. This case comes before this court in a highly unusual posture. The immigration judge, not once but twice, made factual findings that Mr. Agoost is likely to face torture if he is forced to return to Haiti based on a confluence of factors, including his severe mental illness, his status as a criminal deportee with drug-related convictions, and the fact that he's highly Americanized, doesn't speak French or Creole, and has no family in Haiti.